# EXHIBIT D

# Northwestern Journal of International Law & Business

Volume 6
Issue 4 *Winter*

Winter 1985

# Immunity from Seizure for Artworks on Loan to United States Museums

Rodney M. Zerbe

Follow this and additional works at: http://scholarlycommons.law.northwestern.edu/njilb

Part of the International Law Commons

## Recommended Citation

Rodney M. Zerbe, Immunity from Seizure for Artworks on Loan to United States Museums, 6 Nw. J. Int'l L. & Bus. 1121 (1984-1985)

This Article is brought to you for free and open access by Northwestern University School of Law Scholarly Commons. It has been accepted for inclusion in Northwestern Journal of International Law & Business by an authorized administrator of Northwestern University School of Law Scholarly Commons.

# Immunity from Seizure for Artworks on Loan to United States Museums

## I. INTRODUCTION

One of the more recent trends in the funding of art museums in the United States is the increasing use of major loan exhibitions, often from cultural institutions located in other countries.[1] Recognizing the positive aspects of cultural exchange among nations, the federal government has enacted several statutes to encourage the undertaking of loan exhibitions with foreign museums.[2] This comment will focus on one such statute, the Immunity From Seizure Act (the I.F.S.A.).[3]

The I.F.S.A. provides the President with the authority to grant immunity from seizure under judicial process for artworks temporarily in the United States under a loan agreement with a United States museum.[4] Since its enactment in 1965, the I.F.S.A. has been resorted to with increasing frequency by American museums to assure foreign lenders that their artworks will be safely and promptly returned to them.[5] Yet, while the I.F.S.A. plays a significant role in promoting cultural exchange with

---

[1] For an examination of the growth of loan exhibition use as a response to declining museum revenues from more traditional sources of financing, such as contributions and endowments, see Hodes and Gross, *Museums in the Commercial Marketplace: The Need for Licensing Agreements*, 10 CONN. L. REV. 620 (1978). *See generally* Griffin, *Diversifying and Marketing Museums in the Eighties*, F. FELDMAN & S. WEIL, ART WORKS: LAW, POLICY AND PRACTICE at 735-73 (1974).

[2] *See, e.g.,* the Arts and Artifacts Indemnity Act, 20 U.S.C. §§ 971-977 (1982), which provides for the granting of insurance by the federal government for art loan exhibitions. The Act provides indemnity for exhibitions which are "(A) of educational, cultural, historical, or scientific value, and (B) the exhibition of which is certified by the Director of the United States Information Agency or his designee as being in the national interest." 20 U.S.C. § 972(a).

[3] 22 U.S.C. § 2459 (1982). *See infra* note 18 and accompanying text for the full text of the statute.

[4] 22 U.S.C. § 2459.

[5] The I.F.S.A. requires publication of determinations of immunity in the Federal Register. 22 U.S.C. § 2459(a). From the first published determination on February 27, 1970 (35 Fed. Reg. 3,825) through November 4, 1985 (50 Fed. Reg. 45,885), there have been one hundred twenty-five separate grants of immunity under the statute, not counting amendments or extensions of previously published determinations.

Northwestern Journal of
International Law & Business                           6:1121(1984-85)

other countries, it has received virtually no legal examination to date.[6]
This Comment will undertake a more thorough evaluation of the design,
purpose, and administrative treatment of the I.F.S.A.

This Comment will first examine the text of the I.F.S.A. to determine the scope of protection available under the Act.[7] Second, this Comment will note the Congressional purposes underlying the I.F.S.A., as evidenced by the available legislative history.[8] Third, this Comment will examine the scope of immunity available under the Act.[9] Fourth, this Comment will consider the procedures and substantive criteria employed in deciding whether immunity should be granted.[10] Finally, this Comment will question the compatability of the I.F.S.A. with the more recently enacted Foreign Sovereign Immunities Act of 1976, under which Congress transferred the authority for granting immunity to foreign sovereigns from the State Department to the courts, in order to "depoliticize" determinations of immunity.[11]

As will be demonstrated, the I.F.S.A. is effective in serving the Congressional objective of promoting cultural exchanges between nations.[12] Nevertheless, the I.F.S.A. could better serve that objective by clarifying the standards and procedures for determining whether immunity should be granted,[13] providing for review of grants or denials of immunity,[14] and neutralizing the political influences which presently impact on determinations of immunity.[15]

## II.   THE IMMUNITY FROM SEIZURE ACT

The I.F.S.A. was approved by Congress on October 19, 1965,[16] and has remained in force without amendment since that date.[17] The text of the Act is as follows:

§ 2459.   Immunity from seizure under judicial process of cultural objects imported for temporary exhibition or display
(a)   Agreements:  Presidential determination; publication in Federal Regis-

---

[6] The text of 22 U.S.C. § 2459 and the House Report on the statute was reproduced without discussion in F. FELDMAN & S. WEIL, *supra* note 1, at 587-90 (1975).

[7] *See infra* notes 16-20 and accompanying text.

[8] *See infra* notes 21-47 and accompanying text.

[9] *See infra* notes 48-90 and accompanying text.

[10] *See infra* notes 91-143 and accompanying text.

[11] *See infra* notes 144-60 and accompanying text. The Foreign Sovereign Immunities Act of 1976 is codified in 28 U.S.C. §§ 1330, 1332(a)(2), (4), 1391(f), 1441(d) and 1602-1611 (1982).

[12] *See infra* notes 21-47 and accompanying text.

[13] *See infra* notes 98-132 and accompanying text.

[14] *See infra* notes 141-43 and accompanying text.

[15] S. 2273, 89th Cong., 1st Sess., 111 CONG. REC. 27,909 (1965).

[16] Pub. L. No. 89-259, 796 Stat. 985 (codified at 22 U.S.C. § 2459 (1982)).

[17] 22 U.S.C.A. § 2459 (West 1979 & Supp. 1985).

1122

ter. Whenever any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner or custodian thereof and the United States or one or more cultural or educational institutions within the United States or one or more cultural or educational institutions within the United States providing for the temporary exhibition or display thereof within the United States at any cultural exhibition, assembly, activity, or festival administered, operated, or sponsored, without profit, by any such cultural or educational institution, no court of the United States, any State, the District of Columbia, or any territory or possession of the United States may issue or enforce any judicial process, or enter any judgment, decree, or order, for the purpose or having the effect of depriving such institution, or any carrier engaged in transporting such work or object within the United States, of custody or control of such object if before the importation of such object the President or his designee has determined that such object is of cultural significance and that the temporary exhibition or display thereof within the United States is in the national interest, and a notice to that effect has been published in the Federal Register.

(b)   Intervention of United States attorney in pending judicial proceedings. If in any judicial proceeding, in any such court, any such process, judgment, decree, or order is sought, issued, or entered, the United States attorney for the judicial district within which such proceeding is pending shall be entitled as of right to intervene as a party to that proceeding, and upon request made by either the institution adversely affected, or upon direction by the Attorney General if the United States is adversely affected, shall apply to such court for the denial, quashing, or vacating thereof.

(c)   Enforcement of agreements and obligations of carriers under transportation contracts.  Nothing contained in this Act [this section] shall preclude (1) any judicial action for or in aid of the enforcement of the terms of any such agreement or the enforcement of the obligation of any carrier under any contract for the transportation of any such object of cultural significance; or (2) the institution or prosecution by or on behalf of any such institution or the United States of any action for or in aid of the fulfillment of any obligation assumed by such institution or the United States pursuant to any such agreement.[18]

The essence of the I.F.S.A. is that, upon a published Executive determination prior to importation that the object is "of cultural significance" and that the object's temporary exhibition within the United States is "in the national interest," no state, federal, or territorial court may issue any judicial process or enforce any order or judgment against the object.[19] The I.F.S.A. thus provides a broad cloak of immunity for cultural objects imported for temporary exhibition in United States museums.[20]

---

[18] 22 U.S.C. § 2459 (1982).

[19] *Id.*

[20] *See infra* notes 48-90 and accompanying text for an examination of the extent of immunity available under the Act.

Northwestern Journal of
International Law & Business                    6:1121(1984-85)

### III.  LEGISLATIVE HISTORY

The legislative history of the I.F.S.A. indicates a congressional determination to promote and increase the number of temporary loan exhibitions of cultural material, particularly from countries with which the United States has had hostile or volatile relations.[21]  Correspondence from the Justice Department to the Senate Judiciary Committee while the bill was being considered stated that "the commendable objective of this legislation is to encourage the exhibition in the United States of objects of cultural significance which, in the absence of assurances such as are contained in the legislation, would not be made available."[22]  Congress recognized that cultural exchange can produce substantial benefits, both artistically and diplomatically.[23]  The House Judiciary Committee stated that "the purposes of this proposed legislation are salutary and will contribute to the educational and cultural development of the people of the United States."[24]  Cultural exchange enriches the importing country by both educating and stimulating further artistic activity.[25]  In addition, art is a "good ambassador" for the exporting country, helpful in breaking down parochialism and in fostering international understanding.[26]

The adoption of the I.F.S.A. was supported by the Smithsonian Institution, the American Association of Museums, the Department of Jus-

---

[21] Telephone interview with John Lindberg, Esq., General Counsel of the U.S.I.A. (Feb. 20, 1984).
A strong sponsor of the bill was Senator Harry F. Byrd, Sr. of Virginia. The motivation for his staunch support of the bill was a pending exchange between a Soviet museum and the University of Richmond, through which the Virginia gallery sought to import several artworks that had been appropriated by the Soviet government from expatriots. As a condition to the loan, the Soviets insisted on a grant of immunity from seizure as protection against former Soviet citizens who had valid claims to the title of the works. Thus, the enactment of the statute was stimulated in part by a desire to facilitate a pending exchange with the Soviet Union, despite the presence of valid claims to the artwork by United States citizens. In this light, the statute can be seen to represent a legislative preference for the benefits of cultural exchange over the claims of United States citizens.

[22] S. REP. NO. 747, 89th Cong., 1st Sess. 3 (1965).  The Department of Justice correspondence was drafted by Deputy Attorney General Ramsey Clark.  See also H. R. REP. NO. 1070, 89th Cong., 1st Sess. 2-3 (1965), reprinted in 1965 U.S. CODE CONG. & AD. NEWS 3576, 3578 considering the I.F.S.A., and containing reprints of correspondence from the State Department and Department of Justice supporting the adoption of the bill.

[23] The positive functions of the free flow of cultural materials between countries are outlined in Nafziger, The Final Act of the Helsinki Conference: An Artists' Liberation Movement or a Voyage to Laputa? 26 CLEV. ST. L. REV. 561, 563-65 (1977).  See also Hammer, The Importance of Cultural Exchange, 44 AMERICAN ARTIST April 1980, 12; S. WILLIAMS, THE INTERNATIONAL AND NATIONAL PROTECTION OF MOVEABLE CULTURAL PROPERTY: A COMPARATIVE STUDY (1978).

[24] H.R. REP. NO. 1070, 89th Cong., 1st Sess. 2 (1965), reprinted in 1965 U.S. CODE CONG. & AD. NEWS 3576, 3578.

[25] Bator, An Essay on the International Trade in Art, 34 STAN. L. REV. 275, 306 (1982).

[26] Id.

tice, and the State Department, whose correspondence to the Congressional committees considering the bill stated that the I.F.S.A. was "consistent with the Department's policy to assist and encourage educational and cultural interchange," and that its enactment "would be a significant step in international cooperation."[27] In summary, it is evident that the primary purpose of Congress in enacting the I.F.S.A. was to encourage and assist cultural exchange with other countries.[28]

While Congress may have been certain as to the purpose underlying the I.F.S.A., there was some question as to whether the Act was necessary.[29] In the House debate on the bill, Representative Byron Rogers defended the importance of immunity from seizure in encouraging cultural exchanges, stating that the bill was designed to assure foreign countries contemplating sending exhibits to the United States that "they would not be subjected to a suit and an attachment in this country."[30] Although no similar legislation had existed prior to the adoption of the

---

[27] S. REP. No. 747 and H. R. REP. No. 1070, *supra* note 22, at 2.

[28] The historical bases of the I.F.S.A. can be found in several late-nineteenth century conventions on the laws and customs of war. The Hague Conventions of 1899 and 1907 evidence a similar concern for the protection of artworks and museum property:

The property of municipalities, that of institutions dedicated to religion, charity and education, the arts and sciences, even when state property, shall be treated as private property.

All seizure of, destruction or wilfull damage done to institutions of this character, historic monuments, works of art and science, is forbidden, and should be made the subject of legal proceedings. Article LVI, *Hague Convention on Laws and Customs of War on Land*, 1907, *reprinted in* 1 J. MERRYMAN & A. ELSEN, LAW, ETHICS AND THE VISUAL ARTS 1-28 (1979).

Article 14 of the 1954 *Hague Convention for the Protection of Cultural Property in Event of Armed Conflict, reprinted in* 1 J. MERRYMAN & A. ELSEN, *supra* at 1-69 (1979), further broadens the concept of immunity from seizure:

Immunity from seizure, placing in prize, or capture shall be granted to:
(a) cultural property . . . and
(b) the means of transport exclusively engaged in the transfer of such property.

Since the enactment of the I.F.S.A. in 1965, further international activity has occurred with respect to the international movement of artworks. *See* the UNESCO Convention on the Illicit Movement of Art Treasures, Nov. 14, 1970, 10 INT'L LEGAL MATERIALS 289 (1971), along with the United States Implementation Act, (Pub. L. 97-446, 96 Stat. 2329); UNESCO Recommendation concerning the International Exchange of Cultural Property, Nov. 26, 1976; and UNESCO Recommendation on the Protection of Movable Cultural Property, Nov. 28, 1978. *See generally* Symposium, *Jurisdictional Issues in the International Movement of Cultural Property*, 10 SYR. J. INT'L L. & COM. 279-404 (1983); Bator, *supra* note 25.

[29] *See* 111 CONG. REC. 25,928-29 (1965).

[30] *Id.* at 25,929. The text of the debate is as follows:

The Clerk called the bill (S. 2273) to render immune from seizure under judicial process certain objects of cultural significance imported into the United States for temporary display or exhibition and for other purposes.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

Mr. GROSS. Mr. Speaker, reserving the right to object, I should like to ask someone what prompts the necessity for this legislation? The report is not clear. . .

Mr. ROGERS of Colorado. The bill is consistent with the policy of the Department of State to assist and encourage educational and cultural exchange. Its enactment would be a

Northwestern Journal of
International Law & Business

6:1121(1984-85)

I.F.S.A., the implication from the House and Senate Reports is that the bill would enable cultural interchange with certain countries that would simply not occur in the absence of a federal grant of immunity.[31]

Prior to the enactment of the I.F.S.A., a court could act *in rem* or *quasi in rem* on any property present within the court's jurisdiction.[32] Action by seizure, attachment, or garnishment could be undertaken regardless of the status or whereabouts of the owner of the property.[33] If the owner of the property was a foreign government, it could plead sovereign immunity as a defense to an action,[34] or could invoke the aid of the Executive to suggest immunity to the court on its behalf.[35] The United

---

significant step in international cooperation this year, which has been proclaimed by the President as International Cooperation Year.

The Department of State is informed that both the Smithsonian Institution and the American Association of Museums support this legislation.

If a foreign country or an agency should send exhibits to this country in the exchange and cultural program and someone should decide that it is necessary for them to institute a lawsuit against that particular country or those who may own the cultural objects, the bill would assure the country that if they did send the objects to us, they would not be subjected to a suit and an attachment in this country.

Mr. GROSS. What has been the experience with respect to seizure of objects which have been brought to the United States in the past? Have any suits been brought to seize them?

Mr. ROGERS of Colorado. So far as I know there have not been any suits instituted heretofore, nor has there been much of an exchange under the cultural program in this area.

Mr. GROSS. Does the gentleman anticipate quite an increase in the exchange of cultural objects?

Mr. ROGERS of Colorado. We just want to assure the individuals, if they do want to cooperate, that they will not subject themselves to lawsuits in this country.

Mr. GROSS. I am not going to object to this bill. I do not believe it can do any harm, and I do not believe it is going to do any good. According to the gentleman from Colorado, there has not been a single suit brought against a single individual who has brought some cultural object to this country. As far as I know it can do no particular harm, and I do not believe it can do any good. It has cost the taxpayers some money to go through a rigmarole which is utterly meaningless, in the light of past experience. I am not going to object, since it has gone this far. The printing has been done. But I hope that in the future we will not be burdened with bills and reports of this kind.

[31] S. REP. No. 747 and H. R. REP. No. 1070, *supra* note 22, at 2-3.

[32] *See* Pennoyer v. Neff, 95 U.S. 714 (1878), holding that "every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory." *Id.* at 722.

[33] *Id.* at 727. *See generally* 1 J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 0.66 (2d ed. 1985).

[34] *See* Compania Espanola de Navegacion Maritima v. The Navemar, 303 U.S. 68, 74 (1938), considering whether the vessel of foreign government was immune from suit in the United States Admiralty courts. The Court held:

[A] vessel of a friendly government in its possession and service is a public vessel, even though engaged in the carriage of merchandise for hire, and as such is immune from suit in the courts of admiralty of the United States. And in a case such as the present it is open to a friendly government to assert that such is the public status of the vessel and to claim her immunity from suit, either through diplomatic channels or, if it chooses, as a claimant in the courts of the United States.

If the claim is recognized and allowed by the executive branch of the government, it is then the duty of the courts to release the vessel upon appropriate suggestion by the Attorney General of the United States, or other officer acting under his direction. The foreign government is also entitled as of right upon a proper showing, to appear in a pending suit, there to assert its claim to the vessel, and to raise the jurisdictional question in its own name or that of its accredited representative. *Id.* (citations omitted).

[35] *See Ex parte* Peru, 318 U.S. 578, 588 (1943). In upholding the executive branch's authority to

States' switch from an absolute to a restrictive theory of sovereign immunity, however, had narrowed the protection afforded by the doctrine of sovereign immunity.[36]

Historically, the United States had adhered to an "absolute" theory of sovereign immunity, under which foreign sovereigns were absolutely immune from suit in United States courts.[37] The policy justifications for an absolute theory of immunity were notions of comity, a desire for reciprocal treatment, standards of public morality and fair dealing, and the practical inability of United States courts to enforce a judgment against a foreign sovereign.[38]

In 1952, the United States abandoned "absolute" sovereign immunity in favor of a "restrictive" theory of sovereign immunity.[39] The restrictive theory distinguished between acts of a foreign state undertaken in its sovereign capacity (*jure imperii*), for which immunity was afforded, and acts of a private or commercial nature (*jure gestiones*), for which immunity was not afforded.[40] A foreign state-owned museum, whose collection included expropriated artworks or other objects of questionable title, could no longer automatically rely on absolute sovereign immunity as a protection against seizure or attachment.[41]

Prior to the enactment of the I.F.S.A., there was also uncertainty as to whether a foreign government could successfully plead the "Act-of-State Doctrine" as a defense to a claim respecting confiscated property.[42] As a general rule, the Act-of-State Doctrine prevents a United States

---

grant immunity, Chief Justice Stone stated that when a seizure occurs, a foreign sovereign "may also present its claim to the Department of State, the political arm of the Government charged with the conduct of our foreign affairs. Upon recognition and allowance of the claim by the State Department and certification of its action presented to the court by the Attorney General, it is the court's duty to surrender the vessel and remit the libelant to the relief attainable through diplomatic negotiations." *Id.*

[36] The United States switched from an absolute to a restrictive theory of sovereign immunity in 1952, accomplished by the so-called "Tate letter," *reprinted in* 26 DEP'T ST. BULL. 984-85 (1952).

[37] *See* The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136 (1812); United States v. Diekelman, 92 U.S. 520, 524 (1976).

[38] *See generally* Carl, *Suing Foreign Governments in American Courts: The United States Foreign Sovereign Immunities Act in Practice*, 33 SW. L.J. 1009 (1979).

[39] *Id.; see supra* note 36.

[40] Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes, 336 F.2d 354 (2d Cir. 1964), *cert. denied*, 381 U.S. 934 (1965). Under the restrictive theory of sovereign immunity, the determination of immunity was a matter for the State Department, and it was the duty of the courts to conform their rulings to the view of the State Department as to whether or not immunity should be granted. 336 F.2d at 360.

[41] For example, the Soviet Union's collections include a number of artworks which were nationalized when their owners fled the country. *See generally* 1 J. MERRYMAN & A. ELSEN, *supra* note 28, at 1-60.

[42] *See* Stroganoff-Scherbatoff v. Weldon, 420 F. Supp. 18 (S.D.N.Y. 1976); Kunstsammlungen zu Weimar v. Elicofon, 478 F.2d 231 (2d Cir. 1973), *cert. denied*, 415 U.S. 931 (1974).

court from adjudicating a dispute which would require the court to assess the legality of the acts of a foreign government recognized by the United States, undertaken within its own sovereign territory.[43] The Act-of-State Doctrine is not a jurisdictional bar. Rather, it is a self-imposed limitation on a court's ability to resolve politically sensitive disputes and is designed to prevent a contravention of the Executive's authority to conduct foreign relations.[44] In 1964, one year prior to the adoption of the I.F.S.A., Congress acted to narrow the scope of the Act-of-State Doctrine by requiring the courts to decide on the merits whether a foreign expropriation violated international law and not to reflexively invoke the Act-of-State Doctrine.[45] The effect of the congressional action was to further decrease the certainty of a foreign lender that its property would not be seized.

A clear determination of immunity under the I.F.S.A. assured a foreign lender of the safety of its artworks by providing more certainty than the Act-of-State Doctrine and the theory of sovereign immunity.[46] Therefore, although the I.F.S.A. may not have been "necessary" to the promotion of cultural exchange, the Act did afford a foreign lender a comforting layer of additional protection. The I.F.S.A. has been resorted to with increasing regularity since its adoption in 1965.[47]

## IV. SCOPE OF IMMUNITY AVAILABLE UNDER THE I.F.S.A.

The I.F.S.A. provides that, upon a grant of immunity by the United States Information Agency (the U.S.I.A.) prior to importation of the objects into the United States:

> [N]o court of the United States, any State, the District of Columbia, or any territory or possession of the United States may issue or enforce any judicial process, or enter any judgment, decree or order, for the purpose or having

---

[43] Stroganoff-Scherbatoff v. Weldon, 420 F. Supp. at 20. The court held that the Act-of-State Doctrine barred a conversion action by the representative of the former owner of a Houdon bust and a Van Dyck portrait, nationalized by the Soviet Union and later sold to a private collector. The court found that the works were expropriated within the sovereign territory of the Soviet Union by the Soviet government, which was recognized by the United States at the time plaintiff's action was brought.

[44] Id. at 21-22.

[45] The Hickenlooper Amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e)(2) (1982), directed the courts to decide a claim that a foreign expropriation violated international law on the merits, and not to automatically invoke the Act-of-State Doctrine.

[46] For a discussion of the extent of immunity available under an I.F.S.A. grant, see infra notes 48-90 and accompanying text.

[47] The I.F.S.A. requires publication of determinations of immunity in the Federal Register. 22 U.S.C. § 2459(a) (1982). In 1981, there were 14 grants of immunity, compared with 15 grants in 1982, 23 grants in 1983, 21 grants in 1984, and 22 published determinations as of November 4, 1985. 50 Fed. Reg. 45,885 (1985).

the effect of depriving such institution, or any carrier engaged in transporting such work or object within the United States of custody or control of such object.[48]

The prohibition against "any judicial process" depriving the United States museum of the control of the object evidences a preference for a broad cloak of immunity which is intended to apply to most all situations in which artworks could be seized while on temporary loan to a United States institution.[49]

There are a variety of situations in which artworks temporarily present in the United States might be seized or deterred. First, a plaintiff might attach artworks prior to judgment to gain jurisdiction over a defendant in an *in rem* or *quasi in rem* proceeding.[50] Second, a plaintiff might attempt prejudgment attachment as security for the defendant's potential liability under a pending claim.[51] Third, a plaintiff might seek an injunction preventing the artwork from being removed from the United States until the resolution of the litigation.[52] Fourth, the Executive may enjoin the defendant from removing the objects from the United States due to a political controversy.[53] Fifth, a plaintiff might attempt post-judgment attachment for the purpose of levying or executing on a judgment against a foreign defendant.[54] Sixth, the exhibiting museum or the carrier involved in transporting the artworks might seize or withhold return to satisfy its own claim against the lender or its sovereign.[55] Finally, there could occur any of a number of miscellaneous deprivations, such as customs seizure,[56] seizure by a trustee in bankruptcy,[57] or seizure because the artworks are considered obscene.[58] This section will analyze

---

[48] 22 U.S.C. § 2459(a).

[49] Congress apparently intended immunity from attachment for most lawsuits. *See supra* note 30.

[50] *See infra* notes 59-70 and accompanying text.

[51] *See infra* notes 71-73 and accompanying text.

[52] *See infra* notes 74-77 and accompanying text.

[53] *See infra* notes 78-80 and accompanying text.

[54] *See infra* notes 81-88 and accompanying text.

[55] *See infra* notes 89-90 and accompanying text.

[56] *See* United States v. Eight (8) Rhodesian Stone Statues, 449 F. Supp. 193, 195 (C.D. Cal. 1978), in which the government brought an *in rem* action to secure forfeiture of statutes illegally imported from Rhodesia, in violation of the Tariff Act of 1930, 19 U.S.C. §§ 1602-1604, 1610, 1618, 1624 (1982) and the United Nations Participation Act of 1945, 22 U.S.C. § 287(c) (1982). The Court held that the government's failure to give adequate notice of the seizure constituted a deprivation of property without due process. *Id.* at 204.

[57] *See* In re Black Watch Farms, Inc., 373 F. Supp. 711 (S.D.N.Y. 1974).

[58] *See* United States v. Ten Erotic Paintings, 432 F.2d 420 (4th Cir. 1970), in which ten explicitly sexual paintings were seized by Customs officials pursuant to § 1305(a) of the Tariff Act, prohibiting the importation of obscene material into the United States. The Court of Appeals held that the failure of the government to contest plaintiff's affidavits of artistic merit warranted the granting of summary judgment for the plaintiff. *Id.*

Northwestern Journal of
International Law & Business                                        6:1121(1984-85)

whether each of the situations listed above are covered by a prior grant of immunity under the I.F.S.A. Also, the "back-up" protection afforded to a foreign sovereign lender under the Foreign Sovereign Immunities Act of 1976 and the Act-of-State Doctrine will be examined.

The language of the I.F.S.A. plainly prevents prejudgment attachment to gain *in rem* or *quasi in rem* jurisdiction.[59] Such a proceeding would require a court to issue an order of attachment; such an order is prohibited by the language of the Act precluding the use of "any judicial process . . . or order" depriving the cultural institution of the custody or control of the object.[60] Moreover, the availability of *in rem* and *quasi in rem* jurisdiction has been substantially limited since the time of the I.F.S.A.'s enactment in 1965. In *Shaffer v. Heitner*,[61] the Supreme Court held that a court could not gain jurisdiction over a non-resident by means that conflict with the Due Process Clause of the Fourteenth Amendement.[62] To establish jurisdiction, there must be sufficient minimum contacts between the defendant and court.[63] The fortuitous presence of a defendant's property within a state will not support jurisdiction where the property bears no relationship to the plaintiff's cause of action.[64] Thus, *quasi in rem* attachment is no longer a concern for a foreign lender, and *in rem* attachment must also comply with the Due Process requirements of *Shaffer v. Heitner*.[65]

A loan from the foreign sovereign itself would receive additional protection under the Foreign Sovereign Immunities Act,[66] which precludes prejudgment attachment to obtain jurisdiction against a foreign sovereign. Section 1609 of the Foreign Sovereign Immunities Act restricts subject matter jurisdiction over foreign sovereigns to *in personam*, abandoning *in rem* and *quasi in rem* as a basis for jurisdiction against a foreign state.[67]

---

[59] 22 U.S.C. § 2459(a).

[60] *Id.*

[61] 433 U.S. 186 (1977).

[62] *Id.* at 208-09.

[63] *Id.* at 209. *See also* International Shoe Co. v. Washington, 326 U.S. 310, 319 (1945).

[64] 433 U.S. at 209.

[65] *Id.*

[66] Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891-2897, codified at 28 U.S.C. §§ 1330, 1332(a)(2), (4), 1391(f), 1441(d) and 1602-1611 (1982). *See also* Carl, *supra* note 38, at 1021.

[67] 28 U.S.C. § 1609 (1982), which reads as follows:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

Sections 1610 and 1611 provide that there is no immunity when: (a) there has been a waiver by the foreign sovereign, (b) the property is used for "commercial activity upon which the claim is

In addition, a foreign sovereign could claim the protection of the Act-of-State Doctrine.[68] Under the Act-of-State Doctrine, United States courts are required to refrain from independent examination of the legality of a taking by a foreign government where that government is recognized by the United States at the time of the law suit, and where the taking of the property by the foreign sovereign occurred within its own territorial boundaries.[69] The Act-of-State Doctrine applies even if the complaint alleges that the taking violated customary principles of international law.[70] Thus, a foreign sovereign interested in lending artworks for exhibition in American museums should consider the additional protection against seizure which the Foreign Sovereign Immunities Act and the Act-of-State Doctrine afford.

The second situation, prejudgment attachment for security, is also prohibited by the terms of the I.F.S.A. because such attachment would require a court order and would therefore constitute a deprivation of property under judicial process.[71] Unlike the I.F.S.A., the Foreign Sovereign Immunities Act allows prejudgment attachment "to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state,"[72] if the foreign state "has explicitly waived its immunity from attachment prior to judgment."[73]

Third, the I.F.S.A. precludes the use of an injunction by a private plaintiff to prevent the removal of the artwork from the United States.[74] The I.F.S.A. prohibits the use of "any judicial process, or the entry of any judgment decree, or order which deprives the United States museum . . . of the custody or control of the artwork."[75] An injunction would

---

based," (c) the execution relates to a judgment establishing rights in property taken in violation of international law, (d) the execution establishes rights in property acquired by succession or gift or in property immovable and located in the United States, and (e) the property relates to a contract of indemnity for the foreign sovereign.

[68] *See supra* notes 42-45 and accompanying text. In International Ass'n of Machinists & Aerospace Workers, 649 F.2d 1354 (9th Cir. 1981), *cert. denied*, 454 U.S. 1163 (1982), the Court held that the enactment of the Foreign Sovereign Immunities Act did not supersede the continued vitality of the Act-of-State Doctrine. *Id.* at 1359-61.

[69] Stroganoff-Scherbatoff, 420 F. Supp. at 20.

[70] *Id.* at 21.

[71] 22 U.S.C. § 2459. The Act is consistent in this regard with Telkes v. Hungarian National Museum, 265 N.Y.A.D. 192 (1st Dept. 1942), where the New York court dismissed an action in which a plaintiff had attached property of the Museum as security. The court held that the Museum was an agent of the Hungarian government and thus immune from suit under the then-prevailing absolute theory of sovereign immunity. *Id.* at 197-98.

[72] 28 U.S.C. § 1610(d)(2) (1982).

[73] 28 U.S.C. § 1610(d)(1).

[74] 22 U.S.C. § 2459(a) (1982).

[75] *Id.*

Northwestern Journal of
International Law & Business                    6:1121(1984-85)

deprive the museum of its control over the movement of the object.[76] In addition, section 1609 of the Foreign Sovereign Immunities Act would protect a foreign state against the use of an injunction. Section 1609 of the Act states that "the property in the United States of a foreign State shall be immune from attachment, arrest, and execution."[77]

Fourth, the I.F.S.A. prevents the post-judgment attachment of an immune object for the purpose of executing a judgment received against a foreign state. Post-judgment attachment falls within the I.F.S.A.'s broad grant of immunity from "any judicial process," because execution of a judgment would necessarily require a court order and judicial activity.[78] It is important to note that the prohibition of post-judgment attachment is consistent with the congressional purpose of promoting cultural exchange under the Act, albeit at the expense of United States citizens who have judgments establishing their rightful ownership of the object.[79]

Under the Foreign Sovereign Immunities Act, a foreign state's property is immune from post-judgment attachment unless:

    (1)  the foreign state has waived its immunity, . . . or
    (2)  the property is or was used for the commercial activity upon which the claim is based, or
    (3)  the execution relates to a judgment establishing rights in property which has been taken in violation of international law, . . . or
    (4)  the execution relates to a judgment establishing rights in property . . . acquired by succession or gift, or which is immovable and situated in the United States, or
    (5)  the property relates to a contractual obligation under a liability or casualty insurance policy for the foreign state or its employees.[80]

Therefore, the Foreign Sovereign Immunities Act, like the I.F.S.A., precludes post-judgment attachment of a foreign country's art works, except where the artworks in question were taken in violation of international law and the party seeking attachment has judicially established its rights in the property.

In contrast with the immunity afforded a foreign sovereign in the above situations, neither the I.F.S.A. nor the Foreign Sovereign Immuni-

---

[76] *See* D. DOBBS, REMEDIES, 105-13 (1973).

[77] 28 U.S.C. § 1609.

[78] 22 U.S.C. § 2459.

[79] *See supra* notes 21-28 and accompanying text. The U.S.I.A. has attempted to safeguard against this possibility by requesting that the United States museum furnish a statement of outstanding claims of which the museum is aware. *See infra* note 97 and accompanying text.

[80] 28 U.S.C. § 1610(a). Under the Foreign Sovereign Immunities Act, a former owner of an illegally expropriated artwork, who has established rights in the work under a judgment may be allowed to attach the property in aid of execution under 28 U.S.C. § 1610(a)(3), if the court finds that the property was taken in violation of international law.

ties Act provides immunity from Executive action. Since an Executive Order does not involve "judicial action," the language of the I.F.S.A. does not prevent such an order from freezing the assets of a foreign sovereign and prohibiting museums from returning artworks on loan from the foreign sovereign.[81]  As yet, no Executive action has been undertaken against objects granted immunity under the I.F.S.A.[82]  In 1979, however, the federal government froze the assets of the Iranian government which were present in the United States during the hostage crisis. The Iranian assets included several artworks owned by Iran and on loan to the National Gallery of Art, the Guggenheim Museum, and the Johnson Museum in New York state.[83]  Since none of those artworks had received a prior grant of immunity under the I.F.S.A., however, the I.F.S.A. was not tested in that instance.[84]

Moreover, the Foreign Sovereign Immunities Act has been held to be ineffective against Executive action.[85]  In *Dames & Moore v. Regan*,[86] the Supreme Court held that Congress' enactment of the Foreign Sovereign Immunities Act did not divest the President of his authority to nullify attachments by private litigants and settle claims by arbitration before the Iran-United States Claims Tribunal.[87]  *Dames & Moore* further held that the President could institute "blocking orders" to freeze foreign assets in the United States for use in negotiating the resolution of a declared national emergency.[88]  Thus, neither the I.F.S.A. nor the Foreign Sovereign Immunities Act provides protection against Executive action.

Finally, the I.F.S.A. would not preclude seizure by the American museum exhibiting the works, or by a carrier transporting the works in the United States. The statute does not directly protect the foreign lender of the artwork; rather, it protects the importing cultural institution or carrier from seizure or attachment.[89]  Under a literal reading of the statute, a museum or carrier is free to attach objects or delay their return in order to exert pressure on the foreign lender. A prior grant of immunity under the I.F.S.A. does not curtail such power.[90]  Thus, the

---

[81] 22 U.S.C. § 2459.

[82] Telephone interview with John Lindberg, *supra* note 21.

[83] S. WEIL, BEAUTY AND THE BEASTS 104-05 (1983).

[84] Telephone interview with John Lindberg, *supra* note 21.

[85] *See* Dames & Moore v. Regan, 453 U.S. 654 (1981); New England Merchant's Nat'l Bank v. Iran Power Generation & Transmission Co., 502 F. Supp. 120 (S.D.N.Y. 1980).

[86] 453 U.S. 654 (1981).

[87] *Id*. at 684.

[88] *Id*. at 673-74.

[89] 22 U.S.C. § 2459(a).

[90] *Id*. The I.F.S.A. merely prevents the use of judicial process, decree or order which has the

Northwestern Journal of
International Law & Business                                          6:1121(1984-85)

immunity from judicial interference under the I.F.S.A. may only collaterally benefit the lender.

In summary, a grant of immunity under the I.F.S.A. protects a foreign lender from prejudgment attachment for jurisdiction or for security on a potential judgment, a prejudgment injunction, and post-judgment attachment. This immunity is buttressed by the sovereign immunity available under the Foreign Sovereign Immunities Act. A foreign lender is probably not immune, however, from Executive action delaying return of the property, or from seizure by the United States museum or carrier.

## V.   CRITERIA AND PROCEDURE FOR GRANTING IMMUNITY

Executive Order Number 12047 details the administrative procedure involved in obtaining immunity under the I.F.S.A.[91] The Executive Order delegates to the General Counsel of the U.S.I.A.[92] the powers conferred upon the President under the I.F.S.A.[93] In the exercise of its administrative role, the U.S.I.A. is required to make several determinations before immunity can be granted: first, that the artworks for which im-

---

purpose or effect "of depriving such institution, or any carrier engaged in transporting such work or object within the United States, of custody or control of such object. . ." *Id.*

[91] Exec. Order No. 12,047, 43 Fed. Reg. 13,359 (1978), amended by Exec. Order No. 12,388, 47 Fed. Reg. 46,245 (1982). The text of Exec. Order No. 12,047 (as amended) is as follows:

Section 1. The Director of the United States Information Agency is designated and empowered to perform the functions conferred upon the President by the above-mentioned Act [this section] and shall be deemed to be authorized, without the approval, ratification, or other action of the President, (1) to determine that any work of art or other object to be imported into the United States within the meaning of the Act [this section] is of cultural significance, (2) to determine that the temporary exhibition or display of any such work of art or other object in the United States is in the national interest, and (3) to cause public notices of the determinations referred to above to be published in the FEDERAL REGISTER.

Section 2. The Director of the United States Information Agency, in carrying out this Order, shall consult with the Secretary of State with respect to the determination of national interest, and may consult with the Secretary of the Smithsonian Institution, the Director of the National Gallery of Art, and with such other officers and agencies of the Government as may be appropriate, with respect to the determination of cultural significance.

Section 3. The Director of the United States Information Agency is authorized to delegate within the Agency the functions conferred upon him by this Order.

[92] The U.S.I.A. (formerly the International Communications Agency) assumed responsibility for administering the Act on March 27, 1978, pursuant to Exec. Order No. 12,047. Prior to that date, from 1965 through 1978, the Act was administered by the State Department. On July 2, 1985, the Director of the U.S.I.A., Charles Z. Wick, delegated the authority to make determinations of immunity to the General Counsel of the U.S.I.A. *See* 50 Fed. Reg. 27,393 (1985).

The purposes of the U.S.I.A. are outlined in 49 Fed. Reg. 12,211 (1984) (revising 22 C.F.R. 504):

The United States Information Agency has responsibility for the conduct of international information, education, and cultural activities to build bridges of mutual understanding between Americans and the other peoples of the world. The United States Information Agency engages in a wide variety of communication activities — from academic and cultural exchanges to press, radio, and television programs — to accomplish its goals of strengthening foreign understanding of American society and support [of] United States policies.

[93] Exec. Order No. 12,047, *supra* note 91.

munity is sought are of "cultural significance"; and second, that the temporary exhibition of the works within the United States is "in the national interest." The U.S.I.A. is required to publish a notice of its determinations in the Federal Register, along with a schedule of exhibition dates and sites.[94] Finally, the exhibition of the objects must not be a commercial venture.[95]

The importing museum is responsible for filing an application for immunity with the U.S.I.A.[96] No formal requirements exist for the filing of an application. It is sufficient for the importing museum to send a letter to the U.S.I.A. stating the following items of information:

(1) a list of all the objects for which immunity is sought;
(2) a brief description of the objects;
(3) an estimation of their value;
(4) a statement establishing their cultural significance;
(5) a list of the places and dates of exhibition and the date the objects are to arrive in the United States;
(6) a copy of the loan agreement between the foreign owner or custodian of the works and the United States importing institution, and any contracts with other United States institutions if there are multiple exhibition sites;
(7) a statement that the exhibition is administered, operated, and sponsored without profit, along with a copy of the United States museum's I.R.C. § 501(c)(3) determination letter, stating that the museum has been designated a non-profit organization under the Internal Revenue Code;

---

[94] *Id.*

A typical notice publication appears as follows:

**UNITED STATES INFORMATION AGENCY**

**Culturally Significant Objects Imported for Exhibition; Determination**

Notice is hereby given of the following determination: Pursuant to the authority vested in me by the act of October 19, 1965 (79 Stat. 985, 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978 (43 FR 13359, March 29, 1978), and Delegation of Authority of June 27, 1985 (50 FR 27393, July 2, 1985), I hereby determine that the objects to be included in the exhibit, "Italian Reneissance Sculpture in the Time of Donatello" (included in the list[1] filed as a part of this determination) imported 50 Fed. Reg. 37,619 (1985).

from abroad for the temporary exhibition without profit within the United States are of cultural significance. These objects are imported pursuant to loan agreements between the Founders Society Detroit Institute of Arts and foreign lenders. I also determine that the temporary exhibition or display of the listed exhibit objects at the Detroit Institute of Arts, Detroit, Michigan, beginning on or about October 21, 1985, to on or about January 5, 1986; and the Kimbell Museum, Fort Worth, Texas, beginning on or about February 24, 1986, to on or about April 27, 1986, is in the national interest.

---

[1] An itemized list of objects included in the exhibit is filed as part of the original document.

[95] 22 U.S.C. § 2459(a).

[96] Telephone Interview with John Lindberg, *supra* note 21.

(8)  a statement of the reasons, if any, why the items would be subject to
    seizure or attachment while in the United States.[97]

The submission of an application by the importing museum communicating the above information begins the administrative process under the I.F.S.A.

The U.S.I.A. must make a determination that the objects for which immunity is sought are of "cultural significance." The General Counsel and Director of the U.S.I.A. undertake an independent evaluation of the cultural significance of the items, in which they "may consult with the Secretary of the Smithsonian Institution, the Director of the National Gallery of Art, and with such other offices and agencies of the Government as may be appropriate with respect to the determination of the cultural significance of the object."[98]

Neither the I.F.S.A. nor the accompanying executive orders provide standards of "cultural significance" to guide the U.S.I.A. in making its determination.[99] Moreover, the U.S.I.A. has not published any rules or regulations which define its standards for assessing the cultural significance of artworks.[100] In possible recognition of its limited expertise in such matters, the U.S.I.A. is generally not a harsh judge of cultural significance. Instead, the agency regularly relies on the good faith assertion of cultural significance made by a competent curator of the importing museum in the application for immunity.[101] Consequently, no exhibition has been denied immunity for the reason that the objects lacked cultural significance.[102] Immunity has been granted for everything from a colossal statute of Ramses II[103] to a Bugatti.[104]

The U.S.I.A. gives much greater consideration to its determination of whether the exhibition is "in the national interest."[105] Executive Order Number 12047 provides that the Director of the U.S.I.A. *"shall* consult with the Secretary of State with respect to the determination of the national interest."[106] Neither the Act nor the Order, however, provide clear standards to guide the U.S.I.A. in determining when an exhibition would be contrary to the national interest, and no regulations or stan-

---

[97] *Id.*

[98] Exec. Order No. 12047, *supra* note 91.

[99] *See* 22 U.S.C. § 2459. It should be noted that the I.F.S.A. is phrased to apply to all objects of cultural significance, and is not limited to traditional works of art such as paintings and sculpture.

[100] Telephone interview with John Lindberg, *supra* note 21.

[101] *Id.*

[102] *Id.*

[103] 50 Fed. Reg. 30,904 (1985).

[104] 50 Fed. Reg. 28,140 (1985).

[105] Telephone interview with John Lindberg, *supra* note 21.

[106] Exec. Order No. 12,047, *supra* note 91 (emphasis added).

*Immunity from Seizure for Artworks on Loan*
6:1121(1984-85)

dards have been adopted.[107]

Proponents of the present system for granting immunity argue that the Executive has been granted broad authority over matters of foreign policy, and that cultural exchange is simply one of many non-governmental activities subject to regulation by the Executive Branch. The Supreme Court has indicated in several decisions that great deference traditionally has been afforded to the Executive in matters of foreign policy, as *Regan v. Wald*[108] most recently exemplifies. The Court's decision in *Regan v. Wald* finds substantial precedent in the earlier Supreme Court decisions of *Haig v. Agee*[109] and *Zemel v. Rusk*,[110] both of which note the broad prerogative of the Executive within the realm of foreign affairs.[111] Given that the Executive has been acknowledged to have the authority to restrict foreign travel of its own citizens in service of foreign policy objectives, it certainly can exercise the same degree of control over the international movement of a foreign citizen's artworks.[112]

Yet while cultural exchange concededly has foreign policy implications, art exhibitions serve a number of interests distinct from purely

---

[107] The Arts and Artifacts Indemnity Act, discussed *supra*, note 2, which provides for the granting of indemnity for loan exhibitions which are of cultural significance and in the national interest, does have criteria for determining when an exhibition is in the national interest. While the Indemnity Act's criteria have not been made applicable to the I.F.S.A., it is interesting to review those standards, as they may provide some explanation for the IFSA. The criteria that are considered in certifying that an exhibition is in the national interest are:

Whether the exhibition for which an indemnity is sought will be carried out under the terms of an official agreement between the United States and a foreign government; or, an international organization; or Whether the exhibition will promote the foreign policy interests of the United States, as well as increasing mutual understanding between the people of the United States and the people of another country or countries.

41 Fed. Reg. 31,409 (1976).

[108] 104 S. Ct. 3026 (1984). In Regan v. Wald, the Court held that the Treasury Department's restriction of certain travel-related transactions with Cuba could not be set aside as a violation of the right to travel. The Court noted that traditionally, great deference granted to the Executive on matters of foreign policy, stating that matters relating to the conduct of foreign relations are so exclusively entrusted to the political branches of governments as to be largely immune from judicial inquiry or interference. *Id*. at 3039.

[109] 453 U.S. 280 (1981). In Haig v. Agee, the Supreme Court held that a citizen's freedom to travel abroad with a United States passport was subordinate to national security considerations, and subject to reasonable regulation by the Executive.

[110] 381 U.S. 1 (1965).

[111] *Haig*, 453 U.S. at 291; *Zemel*, 381 U.S. at 17. The Court in *Zemel* upheld a State Department restriction on the issuance of passports to Cuba, observing that:

[B]ecause of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than it customarily wields in domestic areas. *Id*.

[112] The foreign policy aspects of cultural exchange are noted in the U.S.I.A. statement of purpose, *supra* note 92.

Northwestern Journal of
International Law & Business

6:1121(1984-85)

political concerns—such as education of the public, scholarship, promotion of further artistic activity, and entertainment.[113]  A system of regulation which allows for the denial of immunity because of political considerations risks the submergence of these interests to political concerns and runs counter to Congress' express purpose to encourage cultural exchange.[114]  Since the I.F.S.A. provides no standards to guide the U.S.I.A. in determining when an exhibition is in the national interest, there is a risk that the U.S.I.A. could utilize its broad grant of discretion to forestall exhibitions from politically unpopular countries.  A review of the U.S.I.A.'s rulings under the I.F.S.A., however, reveals that it has rarely exercised its authority in such a negative fashion.[115]  The sole instance in which immunity was denied because the exhibition was not "in the national interest" involved an exhibition of paintings from the Soviet Union's Hermitage Museum.[116]  The Soviet exhibition was scheduled to open at the National Gallery of Art in Washington, D.C., in May, 1980, but was denied I.F.S.A. immunity in the wake of the Soviet invasion of Afghanistan in December of 1979.[117]  The Hermitage collections included several nationalized and expropriated artworks.[118]  Upon the denial of immunity, the exhibition was cancelled.[119]

Since the chilling of Soviet-United States relations subsequent to the

---

[113] *See supra* notes 24-26.

[114] *See supra* notes 21-28 and accompanying text for a discussion of Congressional intent underlying 22 U.S.C. § 2459.

[115] Telephone interview with John Lindberg, *supra* note 21.

[116] N.Y. Times, Jan. 22, 1980, at 8, col. 1.

[117] *Id.*  The prospect of having a major exhibition of Soviet art at the foot of the Capitol building in the wake of the Afghanistan invasion was deemed to be contrary to the national interest; the U.S.I.A. did not rule on the commercial elements of the exchange.  *See* S. WEIL, *supra* note 83, at 105.

   It is possible that the immunity might have been denied to the Hermitage exhibition for reasons apart from political considerations, because of the commercial nature of the loan exhibition.  The underwriter of the exhibition apparently entered into an agreement with the Soviets whereby a not-for-profit subsidiary of the underwriter would sponsor the exhibition and receive the benefits of catalogue and reproduction sales, in exchange for which the parent corporation would provide computer hardware to the Soviet government.  N.Y. Times, July 19, 1980, at 15, col. 2.  The I.F.S.A.'s immunity is not available for "commercial" transactions.

[118] N.Y. Times, Jan. 22, 1980, at 8, col. 1.

   Prior to the denial of immunity for the 1980, Hermitage exhibition immunity was granted to Soviet artworks on eleven separate occasions.  44 Fed. Reg. 25,277 (1979); 44 Fed. Reg. 9,634 (1979); 42 Fed. Reg. 22,212 (1977); 42 Fed. Reg. 15,485 (1977); 41 Fed. Reg. 47,964 (1976); 40 Fed. Reg. 27,270 (1975); 40 Fed. Reg. 10,487 (1975); 40 Fed. Reg. 3,789 (1975); 38 Fed. Reg. 4,583 (1973); 36 Fed. Reg. 24,009 (1971); 35 Fed. Reg. 17,862 (1970).

[119] N.Y. Times, Jan. 22, 1980, at 8, col. 1.  The American sponsor of the exhibition filed suit against the United States on November 17, 1980, seeking $1.3 million in damages resulting from the denial of immunity and the subsequent cancellation of the exhibit.  Minneapolis Tribune, Nov. 18, 1980, at B5, col. 5.  Upon a decision by the General Accounting Office to refrain from forwarding the claim to Congress for resolution, the sponsor decided not to pursue its claim.

invasion of Afghanistan, several individual art works and smaller exhibitions from the Soviet Union,[120] Romania,[121] Poland,[122] and Czechoslavakia[123] have received grants of immunity under the I.F.S.A.  No large scale exhibition of art from the Soviet Union on a par with that of the 1980 Hermitage exhibition has taken place.[124]

In addition to the Hermitage exhibition, the U.S.I.A. has been involved in some controversy about the importation of artworks from Israel.  In 1982, the Metropolitan Museum of Art cancelled an exhibition of archeological materials from Israeli-nationalized West Bank collections, stating that the exhibition of the items would compromise the Museum's position of neutrality, and would pose security problems.[125]  In January of 1984, the Israeli government cancelled a similar exhibition scheduled to open at the Smithsonian Institution in May of 1984 after the Smithsonian declined to exhibit eleven items (out of 320 total items in the exhibition) from the nationalized Rockefeller Museum in East Jerusalem.[126]  The Smithsonian relied on its policy that "material whose title is subject to dispute will not be acquired or shown."[127]  Several months later, the Metropolitan Museum announced that it would exhibit the Smithsonian show of Israeli artworks, including the disputed items.[128]

Finally, on July 2, 1985, Charles Z. Wick, the Director of the U.S.I.A., granted immunity to the objects for the exhibition "Treasures of the Holy Land:  Ancient Art from the Israel Museum," to be exhibited at the Metropolitan Museum of Art beginning on September 1, 1986.[129]  Unlike other grants of immunity under the I.F.S.A., the determination

---

[120] 47 Fed. Reg. 10,919 (1982); 46 Fed. Reg. 5,100 (1981).

[121] 47 Fed. Reg. 13,234 (1982); 45 Fed. Reg. 65,684 (1980).

[122] 49 Fed. Reg. 20,776 (1984).

[123] 48 Fed. Reg. 20,198 (1983); 46 Fed. Reg. 12,551 (1981).

[124] Telephone interview with John Lindberg, *supra* note 21.

The General Counsel of the National Gallery of Art stated in December 1983 that the U.S.I.A. is unwilling to make a determination that an exhibition is in the national interest "too far in advance because they don't know what is going to happen.  Right now we can't get it for anything coming out of the Soviet Union." N.Y. Times, Dec. 29, 1983, § 2 at 6, col. 4 (*quoting* Elizabeth Croog, General Counsel for the National Gallery).

On November 21, 1985, the United States and Soviet Union signed a cultural exchange agreement pursuant to the Reagan-Gorbachev summit meeting.  The agreement reestablishes cultural relations between the two countries, which were suspended in response to the Soviet invasion of Afghanistan in December, 1979.  While the extensive lead time necessary for major exhibitions makes it unlikely that a large scale Soviet exhibition will take place in the near future, the Reagan-Gorbachev agreement will likely produce such exchange in the long-term.

[125] N.Y. Times, Jan. 28, 1984, § 1, at 11, col. 1.

[126] *Id.*

[127] *Id.*

[128] N.Y. Times, June 16, 1984, § 1 at 9, col. 2.

[129] 50 Fed. Reg. 28,058 (1985).

Northwestern Journal of
International Law & Business                    6:1121(1984-85)

for the Israeli exhibition was made subject to the caveat that "the grant of immunity pursuant to this action does not imply any view of the United States concerning the ownership of the exhibit objects."[130] Furthermore, the notice stated that the determination "is not based upon and does not represent any change in the position of the United States regarding the status of Jerusalem or the territories occupied by Israel since 1967."[131] The U.S.I.A.'s cautious statement reveals that a grant of immunity under the I.F.S.A. is often read to constitute government sponsorship or approval of the exhibition, a relationship which the U.S.I.A. chose to expressly disavow in this instance.[132]

In addition to considerations of cultural significance and the national interest, the U.S.I.A. may deny immunity on the grounds that either the exhibition itself or the importing institution are deemed commercial.[133] The I.F.S.A. clearly states that the exhibition must be conducted by a "cultural or educational institution" within the United States, and that it must be "administered, operated, or sponsored without profit."[134]

It is unclear when an exhibition becomes sufficiently commercial so as to lose its not-for-profit status under the I.F.S.A. While the offering for sale of the exhibited works would surely constitute commercial activity, there is a large gray area. The recent structuring of several "blockbuster" exhibitions indicates that loan exhibitions are indeed intended to produce profits.[135] As yet, the "non-commercial" criterion of the I.F.S.A. has not been construed strictly; the U.S.I.A. has granted immunity to several large-scale revenue-producing exhibitions sponsored by established non-profit museums.[136]

---

[130] *Id.*

[131] *Id.*

[132] As an alternative to the political sponsorship inherent in the I.F.S.A., consider Section 12.03 of the New York Arts and Cultural Affairs Law, discussed *infra*, notes 154-60.

[133] 22 U.S.C. § 2459(a).

[134] *Id.*

[135] The Metropolitan Museum of Art earned a reported $4.5 million in profits in 1983 from bookstore sales of material related to that year's exhibition of the Vatican collections. N.Y. Times, Dec. 19, 1983, at 20, col. 1.

[136] 47 Fed. Reg. 52,261 (1982) (Vatican Collections); 41 Fed. Reg. 37,609, 40,192 (1976); 43 Fed. Reg. 14,561 (1978) (Tutankhamun Treasures); 45 Fed. Reg. 48,949 (1980) (The Search for Alexander).

Moreover, on at least two occasions, immunity has been granted for the exhibition of artworks at a commercial gallery. An exhibit of Soviet government-owned artworks in 1979, which was initially displayed at the National Gallery of Art and the Los Angeles County Museum, was granted immunity during its exhibition at the commercial art gallery of M. Knoedler and Company, Inc. in New York City. 44 Fed. Reg. 25,277 (1979).

In addition, a 1973 exhibit of paintings from the Hermitage and Pushkin museums was also granted immunity for display at the Knoedler Gallery in New York, subsequent to exhibition at the

*Immunity from Seizure for Artworks on Loan*
6:1121(1984-85)

Upon a determination that a grant of immunity is in order, the U.S.I.A. is required to publish its decision in the Federal Register.[137] Publication is intended to give constructive notice to potential claimants that the items are protected from seizure.[138] The published determination lists the importing museum, the exhibition name, the lender, the dates and places of exhibition, and the date upon which immunity terminates.[139] A U.S.I.A. decision to deny immunity, however, is not published.[140]

At present, no statutory or administratively defined procedures exist for the appeal of Agency grants or denials of immunity under the I.F.S.A.[141] The absence of an appeal poses problems both for the foreign lender who is denied immunity without sufficient explanation and the United States citizen with a valid claim of title to the immune object. The vague standards employed in determining the "national interest"[142] and "cultural significance"[143] of the exhibition further exacerbates the problem. In short, while the I.F.S.A. grants broad discretion to the U.S.I.A. in passing on applications for immunity, no check has been established to date to monitor its exercise of authority.

## VI. COMPATIBILITY OF THE I.F.S.A. WITH THE TREATMENT OF FOREIGN SOVEREIGNS UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT OF 1976

Since the enactment of the I.F.S.A in 1965, Congress has substantially changed its position with respect to the sovereign immunity afforded to foreign states. In 1976, Congress adopted the Foreign Sovereign Immunities Act,[144] which made several significant revisions in the judicial treatment of foreign sovereigns.

Originally, the United States adhered to an "absolute" theory of sovereign immunity, which stated that foreign sovereigns were absolutely

---

National Gallery, the Los Angeles County Museum, the Art Institute in Chicago, and the Kimbele Art Museum in Fort Worth. 38 Fed. Reg. 4,583, 7,348, 13,681 (1973). Armand Hammer, who initiated the exchange, represented the Knoedler Gallery in making the loan agreement with the Soviet Minister of Culture. *Id.*

[137] 22 U.S.C. § 2459 (a).

[138] Telephone interview with John Lindberg, *supra* note 21.

[139] *See* the sample publication reproduced *supra,* at note 94.

[140] Telephone interview with John Lindberg, *supra* note 21.

[141] *Id.*

[142] *See supra* notes 105-32 and accompanying text.

[143] *See supra* notes 98-104 and accompanying text.

[144] Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891-2897, codified at 28 U.S.C. §§ 1330, 1332(a)(2), (4), 1391(f), 1441(d) and 1602-1611 (1982).

Northwestern Journal of
International Law & Business                 6:1121(1984-85)

immune from suit in United States courts.[145]  In 1952, the United States
switched to the "restrictive" theory of sovereign immunity,[146] which was
codified as the Foreign Sovereign Immunities Act of 1976.[147]  Declining
to adopt the common law doctrine in total, however, Congress made two
major modifications in its enactment of the 1976 legislation.  First, the
Foreign Sovereign Immunities Act created a federal long-arm statute for
suits against foreign governments and their agencies or instrumentalities,
which eliminated *in rem* and *quasi in rem* jurisdiction against foreign
sovereigns in favor of *in personam* jurisdiction.[148]  Second, the exclusive
authority to determine whether the activity of a foreign government
should be granted immunity was transferred from the State Department
to the judiciary.[149]

The preference for *in personam* jurisdiction was based on a recogni-
tion of the irritation caused many foreign sovereigns by the attachment,
and occasional multiple attachment, of their property which was fortui-
tously present in the United States.[150]  The House Report for the Foreign
Sovereign Immunities Act stated that "one of the fundamental purposes
of this bill is to provide a long-arm statute that makes attachment for
jurisdictional purposes unnecessary."[151]  By eliminating *quasi in rem* and
*in rem* jurisdiction, the Foreign Sovereign Immunities Act drastically re-
duced the number of situations in which attachment against a foreign
government could occur.

The Foreign Sovereign Immunities Act's transfer of the power to
grant sovereign immunity from the State Department (where it existed
prior to the adoption of the Act) to the courts has troubling implications
for the I.F.S.A.  The 1976 Act represents a congressional determination

---

[145] *See* Compania Española, 303 U.S. at 74; *ex parte* Peru, 318 U.S. at 588.

[146] *See supra* note 36.

[147] *See* Carl, *supra* note 38, at 1014.

[148] H. R. REP. No. 1487, 94th Cong., 2d Sess. 13, *reprinted in* 1976 U.S. CODE CONG. & AD.
NEWS 6604, 6612. *See also* Geveke & Co. Int'l v. Kompania di Awa, 482 F.Supp. 660 (S.D.N.Y.
1979).

[149] The Foreign Sovereign Immunities Act's declaration of purpose is set forth in 28 U.S.C.
§ 1602, which reads as follows:

The Congress finds that the determination by United States courts of the claims of foreign states
to immunity from the jurisdiction of such courts would serve the interests of justice and would
protect the rights of both foreign states and litigants in United States courts.  Under interna-
tional law, states are not immune from the jurisdiction of foreign courts insofar as their com-
mercial activities are concerned, and their commercial property may be levied upon for the
satisfaction of judgments rendered against them in connection with their commercial activities.
Claims of foreign states to immunity should henceforth be decided by courts of the United
States and of the States in conformity with the principles set forth in this chapter.

[150] Carl, *supra* note 38, at 1021.

[151] H. R. REP. No. 1487, 94th Cong., 2d Sess. 27, *reprinted in* 1976 U.S. CODE CONG. & AD.
NEWS 6604, 6626.

to "depoliticize" sovereign immunity decisions by transferring them from the State Department to the judiciary, where the decisions could be made on a neutral, legal basis rather than on political grounds.[152]  The 1976 Act is thus incongruous with the I.F.S.A., since the I.F.S.A. requires the U.S.I.A. to consult with the State Department on applications for immunity, and to make determinations on political grounds.[153]

An alternative to the I.F.S.A.'s present form, and one which better serves the congressional interest in "depoliticizing" determinations of immunity, is suggested by Section 12.03 of the New York State Arts and Cultural Affairs Law.[154]  Section 12.03 reads as follows:

> § 12.03.  *Exemption from seizure*
> No process of attachment, execution, sequestration, replevin, distress or any kind of seizure shall be served or levied upon any work of fine art while the same is en route to or from, or while on exhibition or deposited by a nonresident exhibitor at any exhibition held under the auspices or supervision of any museum, college, university or other nonprofit art gallery, institution or organization within any city or county of this state for any cultural, educational, charitable or other purpose not conducted for profit to the exhibitor, nor shall such work of fine art be subject to attachment, seizure, levy or sale, for any cause whatever in the hands of the authorities of such exhibition or otherwise.[155]

The New York statute provides "exemption from seizure" for any work of fine art while en route to or on display at a not-for-profit exhibition within the state.[156]  Unlike the I.F.S.A., the New York statute provides immunity to the artwork itself,[157] rather than to the exhibiting museum or common carrier.  More importantly, the New York statute's grant of immunity is automatic, and is effective without resort to any state administrative body.[158]  As such, the New York legislation removes the political pressures that impact on determinations of immunity and avoids the potential for abuse of discretion by an administrative body applying vague decision-making criteria.[159]  Therefore, New York's sec-

---

152 National Airmotive Corp. v. Gov't of State of Iran, 499 F.Supp. 401 (D.D.C. (1980)); Behring Int'l, Inc. v. Imperial Iranian Airforce, 475 F.Supp. 383 (D.N.J. 1979).

153 Exec. Order No. 12,047, *supra* note 91. One explanation for the incongruity is that the I.F.S.A. was enacted in 1965, eleven years before the Foreign Sovereign Immunities Act, when determinations of sovereign immunity were regularly made by the State Department.

154 N.Y. ARTS & CULTURAL AFFAIRS LAW § 12.03 (McKinney 1985).

155 *Id.*

156 *Id.*

157 *Id.*

158 *Id.*; *Cf. supra* notes 91-143 and accompanying text (whereas the grant of immunity under the I.F.S.A. depends on the determinations made by the administrative body, the U.S.I.A., the grant of immunity under the New York statute is automatic, and is not made contingent on political concerns).

159 *Id.*

Northwestern Journal of
International Law & Business                                    6:1121(1984-85)

tion 12.03 is more consistent with the Congressional statement of policy in the Foreign Sovereign Immunities Act and is also consistent with the position that cultural interchange should not be made contingent on unrelated political considerations.[160]  The New York legislature thus represents an attractive alternative to the present form of the I.F.S.A.

## VII.  CONCLUSION

The I.F.S.A. provides for the granting of immunity from seizure under judicial process of cultural objects on loan to United States museums.  The commendable objectives of the legislation included facilitating cultural exchange with foreign countries, thereby building international understanding and appreciation of other cultures, and conferring educational and artistic benefits on United States citizens.  Since its enactment in 1965, the I.F.S.A. has been resorted to with increasing regularity to assure foreign lenders of the safety of their artworks.

Several problems exist in the present legislation.  The procedure employed for the determination of immunity and the vague decision-making criteria of "cultural significance" and "national interest" afford the U.S.I.A. and the State Department broad discretion in passing on applications for immunity.  At present, no defined method for review of the U.S.I.A.'s grants or denials of immunity exists.  Nor is there any check on the exercise of the broad discretion granted to the U.S.I.A.  Furthermore, the present procedure for granting immunity is permeated with political influences, preventing fair and equitable treatment of foreign sovereigns and allowing political considerations to control the free flow of cultural materials.

In addition to the faults in the procedure for granting immunity, the present statute does not adequately describe the scope of immunity and may not fully protect the interests of a foreign lender.  A grant of immunity under the I.F.S.A. does not encompass all of the circumstances under which an artwork might be seized.

A preferable alternative to the federal statute is Section 12.03 of the New York Arts and Cultural Affairs Law.  The New York statute provides immunity for all artworks on temporary loan to New York museums, without regard to the national interest and without resort to administrative discretion.

In summary, the I.F.S.A. serves an important interest in facilitating the temporary exchange of cultural objects between the United States

---

[160] *See supra* notes 21-28 and accompanying text for a discussion of the congressional purposes underlying 22 U.S.C. § 2459.

*Immunity from Seizure for Artworks on Loan*
6:1121(1984-85)

and the rest of the world. This interest could be better served, however, by more clearly defining the scope of immunity available under the statute, and formulating clearer standards to guide the U.S.I.A. in making its determinations of immunity.

*Rodney M. Zerbe*